LEROY FERRELL, as Personal
Representative of the Estate of
LARIAN FERRELL, and on
behalf of survivors, LEROY
FERRELL, and JULIE
FERRELL,

     **Plaintiff,**                               **Case No. 4:21-cv-00397**

v.

FLORIDA DEPARTMENT OF
CORRECTIONS, RICKY DIXON, in
his official capacity as SECRETARY,
and CENTURION OF FLORIDA, LLC,
a health services Corporation,

     **Defendants.**

_____/

## DEFENDANTS FLORIDA DEPARTMENT OF CORRECTIONS AND RICKY DIXON'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANUDM OF LAW

Defendants FLORIDA DEPARTMENT OF CORRECTIONS ("FDOC") and

RICKY DIXON, in his official capacity as Secretary, by and through their

undersigned counsel and pursuant to Rule 56(c), F.R.C.P., hereby move this Court

to enter summary judgment in their favor as to the following counts of Plaintiff's

Complaint:

**Count I** - Custom or Policy of Failure to Protect (42 U.S.C. § 1983) against Defendant Ricky Dixon, in his official capacity as Secretary.

**Count II** - Deliberate Indifference (42 U.S.C. § 1983) against Defendant Ricky Dixon, in his official capacity as Secretary.

**Count IV** - Wrongful Death under State Law (Fla. Stat. 768.19) against Defendant FDOC.

There exists in this case no *genuine* issue of material fact, no rational trier of fact could find for Plaintiff, and Defendant FDOC is entitled to summary judgement as a matter of law.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENTS

This case arises out of the May 18, 2019 incident where FDOC inmate Anthony Hannah ("Inmate Hannah") attacked and mortally wounded fellow FDOC inmate Larian Ferrell ("Mr. Ferrell") in the recreation yard at Cross City Correctional Institution ("Cross City CI").

Plaintiff alleges that Mr. Ferrell's death was caused in part by FDOC's inadequate policies and procedures, deliberate indifference on behalf of FDOC and its officers, and FDOC's negligence. There is no evidence of these claims. Rather,

---

[1] Defendant Dixon is sued in his official capacity only, which is the functional equivalent of suing FDOC itself. *Kentucky v. Graham*, 473 U.S. 159, 105 S. Ct. 3099 (1985); *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). This motion will refer to both Defendant Dixon and Defendant FDOC collectively as "Defendant FDOC."

the record shows that Mr. Ferrell was concerned that he may be attacked by fellow gang members but failed to inform FDOC officials. Inmate Hannah's attack came suddenly and without warning. The FDOC officers bravely responded and attempted to stop the attack, but not before Inmate Hannah could stab Mr. Ferrell.

There is no evidence that a change in FDOC policies would have prevented this attack, or that FDOC officers failed to act reasonably and within their training and policies. Further, Plaintiff fails to properly allege that there was a sufficient generalized threat of violence at Cross City CI that would have caused FDOC to be aware of the danger posed to Mr. Ferrell. For these reasons, summary judgment is appropriate.

## STATEMENT OF FACTS

### A. Larian Ferrell purported to have joined a prison gang at Cross City CI.

Mr. Ferrell's incarceration with FDOC began on February 27, 2018. *Ex. 1, FDOC Inmate Admission Summary.* He was housed at Cross City CI. On December 28, 2018, Officer Cheryl Barnett observed gang materials in Mr. Ferrell's cell belonging to the notorious Bloods gang. *Ex. 2, FDOC Disciplinary Report, January 8, 2019.* Mr. Ferrell was placed in disciplinary confinement. *Ex 3, FDOC Daily Record of Special Housing, December 28, 2018 to January 10, 2019.* He was released from confinement into general population on January 10, 2019. *Id.*

On April 15, 2019, Mr. Ferrell was again caught with contraband, a shank. *Ex. 4, FDOC Disciplinary Report, April 23, 2019.* He was again placed in disciplinary confinement and was released on May 17, 2019. *Ex. 5, FDOC Daily Record of Special Housing, April 15 to May 17, 2019.*

While incarcerated, Mr. Ferrell communicated with his girlfriend, Ms. Shekinah Bryant by phone. On May 18, 2019, Mr. Ferrell had multiple phone calls with Ms. Bryant. Around 3:59 p.m., Mr. Ferrell expressed to Ms. Bryant that the gang leaders were suspicious that he had been purposely caught with contraband so that he would be placed in disciplinary confinement, and avoid participating in a planned gang war.

> "When he saw me last night coming from confinement, this is who I am under, I am up under Stylez. When he saw me last night, he threw it up, threw up our sign. It's been all love, but I think he's more disappointed than anything."
>
> *Ex. 6, Ferrell's 3:59 p.m. May 18, 2019 Call to Bryant at 3:57-4:23*

## B. Mr. Ferrell did not inform Cross City CI officers that he was in fear for his safety.

In a later call at 5:53 p.m., Mr. Ferrell reiterates to Ms. Bryant that he thinks gang leaders are acting suspicious. *Ex. 7, Ferrell's 5:53 p.m. May 18, 2019 Call to Bryant at 4:35, 5:01.* Ferrell also states to Bryant that he did not inform FDOC of the issues he was having with the gang, "I never went and talked to no police. Nobody can say, 'Oh, well he talked to the police before that shit happened. Nobody

can say that." *Id. at 9:00-9:22.* Near the end of the call, Mr. Ferrell says he has a "bad vibe." *Id. at 13:13.* Despite Mr. Ferrell's many phone calls to Ms. Bryant that day, she did not contact FDOC officials about Mr. Ferrell's concerns.

Ms. Bryant tells Mr. Ferrell over the phone around 6:24 p.m. that she will do "anything" he tells her to do in order to address the situation, and he responds, "I know," but never makes a request that she contact the institution. *Ex. 8, Ferrell's 6:24 p.m. May 18, 2019 Call to Bryant at 11:25-11:49.* Mr. Ferrell also had a call with Plaintiff that day, in which no discussion about gang violence or possible threat to Mr. Ferrell's safety was discussed. *Ex. 9, Ferrell's May 18, 2019 Call to Plaintiff.*

Plaintiff can point to no instance in which Mr. Ferrell expressed fear for his safety to FDOC officers. Mr. Ferrell did not ask FDOC officers for help or to be placed in protective custody. Officer David Rhodes had an interaction with Mr. Ferrell before the attack while out on the recreation yard. Mr. Ferrell did not communicate any concerns for his safety:

> "Mr. Ferrell walked -- was about, I don't know, 10- or 15-foot from me, he was walking around in circles saying -- excuse my language -- he was saying, this is effed up, this is effed up. Then he approached me, which is then, a couple of feet, maybe 6 feet. He said, Officer, I'd like to ask you a question. I said, what -- I said, 'yes, what do you need?' And he [said], like, 'aw, never mind.' He goes his hand like that (indicating). I don't know if you can see me. While he was walking off he'd done that (indicating). He said, 'Never mind, don't worry about it.' And then he went on from there. And then I went on to watching the other inmates, it wasn't eight to ten minutes after that, that's when I heard Sergeant Speegle and Sergeant Ward screaming, 'Get on the ground. Get on the ground.' I could hear them from the rec yard over all the other inmates."

*Ex 10, Deposition of Officer David Rhodes, 12:8-25.*

**C. FDOC staff separated Mr. Ferrell from the threat of the attacking inmate, secured the area, and acted appropriately to transfer Ferrell to the medical unit.**

Approximately ten minutes after Mr. Ferrell spoke with Officer Rhodes, the attack began. *Id.* Sgts. Justin Speegle and Justin Ward were standing at the recreation yard gate. *Ex. 11, Incident Report of Justin Speegle.*

At 7:08:33 p.m., Mr. Ferrell began walking backwards toward the gate and the standing officers, with Inmate Hannah following him from a distance. *Ex. 12, Fixed-wing video at 5:32.* As Inmate Hannah moved closer to Mr. Ferrell, he pulled a weapon from his waistband.

Q: At what point did you know that there was a risk of harm to Mr. Ferrell?

A: I would say when I saw the knife -- when I saw Inmate Hanna[h] pull the knife out of his waistband, I knew there was a risk to someone. I didn't know who he was going to try to attack." *Ex. 13, Deposition of Sgt. Justin Ward, 35:22-25, 36:1-2.*

At approximately 7:08:40 p.m., the officers, realizing that something was amiss, moved to separate the two inmates. *Id. at 5:39*. Sgt. Speegle attempted to close the gate to prevent Inmate Hannah from exiting the yard, but Sgt. Speegle was ultimately unsuccessful. *Id. at 5:40.*

Q: It appears at some point Sergeant Speegle is trying to stop Mr. Hanna[h]?

A: Right. That's when he was trying to shut the gate to keep him from being able to get to Inmate Ferrell."

*Ex. 13, Deposition of Sergeant Justin Ward, 42:16-20.*

Mr. Ferrell ran through the gate with Inmate Hannah following. Unfortunately, Inmate Hannah was able to stab Mr. Ferrell in the torso.

Sgt. Ward ordered Inmate Hannah to stop and drop the weapon. *Ex. 14, Incident Report of Sgt. Ward.* He broke the seal on his MK4 chemical agent and issued a continuous stream into the upper torso and facial area of Inmate Hannah. *Id.* Inmate Hannah complied at approximately 7:08:50, when he laid on the ground and placed his hands behind his back. *Ex. 12, Fixed-wing Video at 5:49.*

> "As soon as Inmate Hanna[h] started attacking, we, myself and Sergeant Speegle, administers -- begin to administer the chemical agent. I'm not sure if he ever did or not. I was administering to Inmate Hanna[h] until he dropped the knife, [laid] down and I was able to put hand restraints on [Hannah]."
>
> *Ex. 13, Deposition of Sgt. Justin Ward, 43:2-7.*

The entire attack took approximately 10 seconds.

Immediately after Sgt. Ward put the restraints on Inmate Hannah, he radioed to the control room "for backup, for medical to be enroute and for the shift supervisor to be on scene." *Id. at 43:12-15.*

At the same moment Inmate Hannah had dropped the weapon and Sgt. Ward was restraining him, Sgt. Speegle ordered Mr. Ferrell to get face down on the ground. *Ex. 11, Incident Report of Sgt. Speegle.* At first, Mr. Ferrell did not comply with the orders and ran toward the weapon on the ground. *Ex. 12, Fixed-wing Video at 8:49.* In response, Sgt. Speegle broke the seal on his MK4 chemical agents and issued them in the direction of Mr. Ferrell to "deter him from retrieving the weapon." *Ex.*

*11, Incident Report of Sgt. Speegle.* Mr. Ferrell avoided the stream of chemical agents and eventually complied.[2] Sgt. Ward then retrieved the weapon. *Ex. 12, Fixed-wing Video at 6:00.* Officer Rhodes then arrived and secured the scene by closing the recreation yard gate. *Id.*

At 7:12:20 p.m., approximately three and half minutes after the attack ended, Mr. Ferrell was placed into a wheelchair and transported to the medical unit at Cross City CI. *Id. at 9:19.*

The officers' use of verbal commands and chemical agents was in compliance with FDOC policies, as testified to by FDOC officer training representative, John DeBell.

> Q: And so what tools or defense mechanisms do correction officers have to use as options in the event of an inmate-on-inmate attack?
>
> A: That's going to be based on officer objective reasonableness with regards to what they see and hear…basically, it's an escalation based on what they see. If they come up on a situation controlled by officer presence or officer verbal commands, that's where the situation is going to end. And that can escalate from there to an intermediate weapon which may qualify as chemical agents…the correction officer could use physical force to control the situation if it is necessary. But use of force is always going to be last resort in accordance with 602.210, up to and including deadly force, if necessary.
>
> *Ex. 16, Deposition of John DeBell*, 27:21 – 28:13

**D. Centurion administered medical care to Ferrell, determined his injuries to be life-threatening, and transferred him to Dixie County EMS to be transported to Shands Hospital in Gainesville.**

---

[2] Medical staff corroborated that Ferrell was not struck with chemical agents. *Ex. 15, Witness Statements of Nurses Heiser and Dionne, May 18, 2019.*

At 7:12 p.m., an FDOC officer began filming the response with a handheld camera, as required by FDOC policy. *Ex. 17, Handheld Video.* The footage shows Sgt. Ward and Sgt. Speegle assisting Mr. Ferrell into a wheelchair and Ferrell being wheeled to the medical department, where Nurses James Dionne and Nancy Heiser, both Centurion employees, assessed Mr. Ferrell. After observing the injuries, Centurion staff called 911 and had Dixie County Emergency Medical Services (EMS) in route to Cross City CI. *Id. at 4:33.*

Dixie County EMS arrived at Cross City CI at approximately 7:30 p.m. Ex. Handheld at 17:25. At approximately 9:00 p.m., the ambulance arrived at Shands ER, and Mr. Ferrell was placed in a trauma room before being escorted to the operating room at approximately 9:12 p.m. *Ex. 18, Incident Report of Sgt. Shane Harris.* At 9:40 p.m., Mr. Ferrell was pronounced dead. *Ex. 19, UF Shands Investigator Report.* Inmate Hannah was convicted of second-degree murder and sentenced to life in prison for the murder of Mr. Ferrell.[3]

## MEMORANDUM OF LAW

## I.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show there is no genuine issue as to any material fact and that the

---

[3] *State v. Hannah*, No. 15-2019-CF-000300 (Fla. 3d Jud. Cir.).

moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted); Fed. R. Civ. P. 56(c). An otherwise correctly supported motion for summary judgment cannot be defeated simply due to the existence of some factual disputes between the parties. *Butzer v. CoreCivic, Inc.*, 2018 WL 7144481 (M.D. Fla. Dec. 5, 2018). The precise requirement is that there be "no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party asserting that a fact is genuinely disputed must support the assertion by citing to specific materials in the record because failure to do so allows the court to consider the facts as undisputed for summary judgment purposes. Fed. R. Civ. P. 56(c)(1)(A), (e)(2)).

The Court is not required, however, to deny summary judgment for the moving party when evidence favoring the nonmoving party is "merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249-50. "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990) (quoting *Anderson*, 477 U.S. at 242). "[C]onclusory allegations without specific supporting facts have no probative value," and are legally insufficient to defeat summary judgment. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving

party, there is no 'genuine issue for trial'" and a court should grant summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).*

## II.   ARGUMENT

### A. Standard for §1983, Custom or Policy of Failure to Protect.

To succeed in his § 1983 Custom or Policy claim, Plaintiff must show that (1) Mr. Ferrell's constitutional rights were violated, (2) Defendant FDOC had a custom or policy that constituted deliberate indifference to that particular right, and (3) the policy or custom caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

Plaintiff must identify the 'policy' or 'custom' that caused Mr. Ferrell's injury. *Id.* Custom has been defined as "a practice that is so settled and permanent that it takes on the force of the law. *Wayne v. Jarvis*, 197 F.3d 1098, 1105 (11th Cir. 1999), (quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) *cert. denied*, 522 U.S. 1075, 139 L. Ed. 2d 753 (1998). In order for a plaintiff to demonstrate a policy or custom, it is "generally necessary to show a persistent and wide-spread practice." *Id.* § 1983 does not impose liability for an isolated incident. *See Depew v. City of St. Marys*, 787 F.2d 1496 (11th Cir. 1986) ("Normally, random acts or isolated incidents are insufficient to establish a custom or policy"). Rather, the incident must result from a demonstrated

practice. *See Wayne* at 1106 (determining that a single decision, "even if erroneous, would not support the inference that the County had a custom or policy" in place).

Plaintiff must also establish causation, as "there must be 'a direct causal link between [the] policy or custom and the alleged constitutional deprivation." *Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1271 (11th Cir. 2005) (quotation omitted). Plaintiff must show that Defendant's deliberate action caused a deprivation of federal rights and that this action was "taken with 'deliberate indifference' as to its known or obvious consequences." *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 407, 415 S. Ct. 1382 (1997). A "showing of simple or even heightened negligence is not enough." *Id.* at 407.

Therefore, Plaintiff must establish that Defendant FDOC's policies or customs were such that it deliberately failed to protect Mr. Ferrell's constitutional rights. Plaintiff has not specified which policies or customs he believes were insufficient nor how they were the direct causal link to Mr. Ferrell's death. However, Defendant does have applicable policies that were well-executed by the officers during the attack.

## B. Requirements for a Correctional Officer responding to an emergency.

The guidelines for a correctional officer's response to an emergency are outlined in Rule 33-602.206 Emergency Management, Florida Administrative Code. When responding to an incident such as the one in this case, Rule 33-602.206(4)(a)-

(e), F.A.C., requires "[t]he following tactical priorities shall govern the measures taken to resolve an incident:

(a) Provide for the safety, accountability, and welfare of the public, personnel, and inmates. This priority is ongoing throughout the incident.
(b) Stabilize, isolate, and contain the incident and provide for preservation of life, property, and order.
(c) Remove endangered persons and obtain treatment for the injured.
(d) Conserve expenses and damage to property.
(e) Resolve the incident and return the institution to normal operations.
(f) Ensure the identification, arrest, and prosecution of persons violating the law."

All evidence in this case indicates the FDOC officers responded in accordance with policy and procedure. They quickly apprehended Inmate Hannah, restrained him, and retrieved the weapon. They immediately secured the scene so Mr. Ferrell could be transported from the recreation yard to the medical unit. As outlined in Mr. DeBell's testimony, the FDOC officers followed their training and FDOC policies by using their chemical agents and issuing verbal commands.

**C. Standard for § 1983 Deliberate Indifference.**

In the context of a prisoner-on-prisoner assault, the legal standard for federal civil rights liability against correctional officials and employees is outlined in *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under *Farmer*, prison officials have a duty to protect prisoners from the violence of other prisoners. "It is not, however, every injury suffered by one prisoner at the hands of another that translates into a constitutional liability for prison officials responsible for the victim's safety."

13

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To establish a § 1983 claim for violation of an inmate's Eighth Amendment rights, the plaintiff must show sufficient evidence of:

> 1. A substantial risk of serious harm;
> 2. The defendant's deliberate indifference to that harm; and
> 3. Causation.
> *Id.* (quoting *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995)).

"Substantial risk of serious harm" has been interpreted to mean that "there must be a 'strong likelihood' of injury, 'rather than a mere possibility,' before an official's failure to act can constitute deliberate indifference." *Estate of Owens v. GEO Grp.*, Inc, 660 Fed. Appx. 763, *767 (11th Cir. 2016), quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990). Furthermore, the alleged risk "must be actual, rather than potential or speculative." *Estate of Owens v. GEO Grp.*, Inc, 660 Fed. Appx. 763, *767 (11th Cir. 2016). Just because a prisoner is exposed to the potential for a fight "does not, in and of itself, constitute substantial risk of harm." *Estate of Owens v. GEO Grp.,* Inc, 660 Fed. Appx. 763, *767 (11th Cir. 2016), *citing Purcell v. Toombs County*, 400 F.3d 1313, 1323 (11th Cir. 2005).

The United States Supreme Court has defined "deliberate indifference" in these cases to mean "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer,* 511 U.S. at 837. The prison official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. Therefore, deliberate indifference requires: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that amounts to more than mere negligence." *Estate of Owens v. GEO Grp.*, Inc, 660 Fed. Appx. 763, *767 (11th Cir. 2016), citing *Carter v. Galloway,* 352 F.3d 1346, 1349 (11th Cir. 2003).

A plaintiff's claim must fail when no actual knowledge of the substantial risk exists because to hold otherwise violates the subjective component of the analysis. *Estate of Owens*, 660 Fed. Appx. at *767, see *Farmer,* 511 U.S. at 837-38. Additionally, even if a prison official knew of a substantial risk to inmate safety, he may be found free from liability if he responded reasonably to the risk, even if the harm was not averted. *Farmer*, 511 U.S. at 844.

For a defendant to be liable for failure to protect, "there must be much more than mere awareness" that the attackers were problem inmates with a well-documented history of prison disobedience and propensity for violence. *Williams v. Simmons,* 2014 WL 1664549, *7 (N.D. Fla. April 24, 2014), citing *Carter v. Galloway,* 352 F.3d 1346, 1349 (11th Cir. 2003). The Defendants "must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists-and the prison official must also 'draw that inference'." *Id.*, citing *Carter*, 352 F.3d at 1349 (quoting *Farmer,* 511 U.S. at 837).

**D. Mr. Ferrell actively avoided informing Defendant of his concerns for his personal safety.**

Plaintiff cannot show awareness on the part of FDOC as to the potential danger Inmate Hannah posed to Mr. Ferrell. Mr. Ferrell did not inform FDOC officials that he was believed he was in danger, and never instructed Ms. Bryant to contact FDOC officials. Because of Mr. Ferrell's failure to act, FDOC officers were made aware of the threat to his safety the moment he was attacked.

The subjective awareness requirement is not met if Plaintiff merely proves a "generalized awareness of risk" that an inmate is problematic because "merely negligent failure to protect an inmate from attack does not justify liability under section 1983." *Id.*, citing *Carter*, 352 F.3d 1350 (quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990)).

**E.    Plaintiff has failed to demonstrate a there was a generalized risk to Mr. Ferrell's safety.**

In general, a plaintiff must show "more than a generalized awareness of risk" to succeed in a deliberate-indifference claim. *Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019) (quoting *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1101 (11th Cir. 2014). To meet the high bar of deliberate indifference based on generalized risk, Plaintiff must show "that serious inmate-on-inmate violence was

the norm or something close to it." *Purcell ex rel. Estate of Morgan v. Toombs Cty.*, 400 F.3d 1313, 1320 (11th Cir. 2005).

Excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm, while occasional, isolated attacks by one prisoner on another may not. *Id.* (quoting *Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973)). Plaintiff would have to demonstrate that Mr. Ferrell was exposed to a "constant threat of violence." *Id; Zatler v. Wainwright,* 802 F.2d 397, 400 (11th Cir. 1986). Substantial risk of serious harm is an objective standard that embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . .,'" but must be balanced against competing penological goals." *LaMarca v. Turner,* 995 F.2d 1526, 1535 (11th Cir. 1993).

Plaintiff is unable to demonstrate that there was a sufficient generalized risk of harm to Mr. Ferrell at Cross City CI. Plaintiff fails to even allege specific instances that demonstrate a constant threat of violence by other inmates at Cross City CI. He cites only one inmate death that occurred at the prison in the two years succeeding Mr. Ferrell's death, but fails to give the cause of death. *Amended Complaint, ¶28.* This is despite alleging that "Cross City Correctional Institution has been one of the leaders in forms of inmate-on-inmate assault." *Amended Complaint, ¶12.* If it were the case that there were an excessive number of homicides at Cross City CI, Plaintiff

could have specifically alleged this in the Complaint without the benefit of discovery, as inmate death statistics are public record and available online.[4]

**F.     FDOC officers acted reasonably in response to Inmate Hannah's attack.**

*Farmer* plainly states that even if a prison official knows of a substantial risk to inmate safety, he may be found free from liability if he responded reasonably to the risk, even if the harm was not averted. *511 U.S.* at 844. That is precisely what occurred in this case. The officers given only seconds to respond once they were aware of the risk to Mr. Ferrell. While they ultimately did not avert the harm that befell Mr. Ferrell, they responded reasonably and within FDOC policies.

No rule of constitutional law requires unarmed prison officials to endanger their own safety in order to protect a prison inmate threatened with physical violence. *Williams v. Simmons*, 2014 WL 1664549, at 9 (N.D.Fla. Apr. 24, 2014) (citing *Seals v. Marcus*, 2013 WL 656873, at 8 (M.D.Ga. 2013) (internal quotations omitted). When the undisputed evidence shows that an armed attack is brief in duration and the responding unarmed officers do not have a realistic chance to physically intervene during the attack, summary judgment must be granted. *Id.*

---

[4] http://www.dc.state.fl.us/pub/mortality/index.html

Here, the attack on Mr. Ferrell was extremely brief and the responding officers, armed only with chemical agents, did not have a realistic chance to physically intervene before Mr. Ferrell was stabbed. Rather, they administered chemical agents and gave verbal commands in a manner consistent with their training. Despite the suddenness of the attack, the officers were able to apprehend Inmate Hannah in a matter of seconds, unfortunately not before he was able to mortally wound Mr. Ferrell.

### G. Defendant FDOC did not violate the Florida Wrongful Death Act.

§ 768.19, Florida Statutes provides for a right of action on behalf of an estate and survivors:

> "When the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person…and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued, the person…that would have been liable in damages if death had not ensued shall be liable for damages as specified in this act notwithstanding the death of the person injured, although death was caused under circumstances constituting a felony."

An action for wrongful death is a purely statutory right. *Toombs v. Alamo Rent-A-Car*, 833 So. 2d 109 (Fla. 2002); *Capone v. Philip Morris, USA, Inc.*, 116 So. 3d 363 (Fla. 2013); *Jerrels v. Jerrels,* 276 So. 3d 362 (Fla. 2d DCA 2019). Because wrongful death actions did not exist at common law, all claims for wrongful death are created and limited by these statute sections. *Cinghina v.*

*Racik*, 647 So. 2d 289 (Fla. 4th DCA 1994); *Weaver v. Myers*, 229 So. 3d 1118 (Fla. 2017). The purpose of the Act is to "shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer." Fla. Stat. § 768.17.

To establish negligence in a wrongful death action, a plaintiff must show (1) the existence of a legal duty owed to the decedent, (2) a breach of that duty, (3) that the legal or proximate cause of death was that breach, and (4) consequential damages. *Jenkins v. W.L. Roberts, Inc.*, 851 So. 2d 781 (Fla. 1st DCA 2003).

Defendant FDOC did not breach its duty to Mr. Ferrell and did not cause his death. As outlined above, FDOC officials at all times acted reasonably in response to the sudden attack on Mr. Ferrell. Plaintiff has failed to establish how any FDOC policy or officer was the proximate cause of Mr. Ferrell's death. The sole wrongdoer in this case was Inmate Hannah.

### H. FDOC and Centurion employees acted reasonably in attending to Mr. Ferrell's medical needs.

Regarding the medical care that Mr. Ferrell received subsequent to the attack, Defendant FDOC cites and incorporates by reference the Centurion of Florida, LLC's Summary Judgment Motion [Docket #46].

As for the FDOC officers, Sgt. Ward radioed medical staff to the scene almost immediately after the attack. The video footage depicts the FDOC officers assisting

with escorting Mr. Ferrell to the medical unit and eventually to the ambulance. There is no evidence that FDOC officers acted unreasonably or outside FDOC policies and procedures with respect to Mr. Ferrell's medical care.

## CONCLUSION

While the loss of human life is always a tragedy, not every loss of life gives rise to an actionable claim. Defendant FDOC/Dixon did not wrongfully cause Mr. Ferrell's death. FDOC officers did everything reasonably possible to protect Mr. Ferrell. Therefore, the Court should enter summary judgment in Defendants' favor.

Respectfully submitted,

*/s/ Liane S. LaBouef*
Liane S. LaBouef
Florida Bar No. 1025198
Howell, Buchan & Strong
2898-6 Mahan Drive
Tallahassee, Florida 32308
Telephone: (850) 877-7776
*Attorney for Defendants FLORIDA*
*DEPARTMENT OF CORRECTIONS*
*and RICKY DIXON*

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

Undersigned counsel hereby certifies that this motion and incorporated memorandum of law contains 4,930 words, excluding the case style, signature block, and certificate of service. The foregoing word count has been calculated utilizing Microsoft Word, the word processing software used to prepare this motion and incorporated memorandum of law. The word count of this motion has complied with procedure required by Local Rule 5.1 and Local Rule 7.1.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record by CM/ECF this 21st day of September, 2022.

*/s/ Liane S. LaBouef*
Liane S. LaBouef