## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**LEROY FERRELL, as Personal
Representative of the Estate of
LARIAN FERRELL, and on behalf
of survivors LEROY FERRELL
and JULIE FERRELL,**

     **Plaintiff,**

**vs.**                                        **Case No. 4:21cv397-WS-MAF**

**FLORIDA DEPARTMENT OF
CORRECTIONS, RICKY DIXON, in
his official capacity as SECRETARY,**

     **Defendants.**

_____/

### FOURTH REPORT AND RECOMMENDATION[1]

After the resolution of several motions to dismiss, and Plaintiff's

voluntary dismissal of the claim against Defendant Centurion of Florida,

---

[1] The first Report and Recommendation, ECF No. 21, recommended denying Plaintiff's motion to remand this case to state court, ECF No. 13, and was adopted. ECF No. 25. The second Report and Recommendation, ECF No. 26, recommended granting in part the motion to dismiss, ECF No. 9, filed by Centurion of Florida, LLC, ECF No. 26. It also was adopted. ECF No. 28. The third Report and Recommendation, ECF No. 34, recommended granting in part the motion to dismiss, ECF No. 19, filed by the John Doe Defendants, Defendant Hicks, and the Department of Corrections. That recommendation was also adopted. ECF No. 36.

ECF No. 55, this case proceeds against the Florida Department of Corrections ["FDOC"] and Defendant Ricky Dixon, sued in his official capacity only.  Plaintiff's § 1983 Amended Complaint, ECF No. 39, was filed on June 10, 2022, and asserts three claims:[2] (1) an Eighth Amendment claim against Defendant Dixon for failure to protect; (2) an Eighth Amendment claim against Defendant Dixon for deliberate indifference to Plaintiff's safety; (3) a Wrongful Death Act claim against the FDOC.  ECF No. 39 at 7-18.  Defendants Dixon and the FDOC filed an Answer, ECF No. 41, on June 17, 2022.  At the conclusion of the discovery period, Defendants Dixon and the FDOC filed a motion for summary judgment.  ECF No. 51.  Plaintiff has responded, ECF No. 58, and the motion is ready for a ruling.

**Summary of the Case**

On May 18, 2019, FDOC inmate Larian Ferrell was attacked and fatally wounded by another inmate, Anthony Hannah, at Cross City Correctional Institution.  ECF No. 51 at 2.  At the time of his death, Mr. Ferrell was 32 years of age.  ECF No. 39 at 18.  The amended complaint alleged that inmate Hannah was able to fatally injure Mr. Ferrell

---

[2] Although the complaint asserted a claim against Centurion of Florida, Plaintiff has subsequently stipulated to the dismissal of that Defendant.  ECF No. 55.

because of the Defendants' constitutional violations.  *Id.* at 3.  Defendants

assert at summary judgment that there is no evidence that inadequate

FDOC policies caused or led to the attack, or that a change in policies

would have prevented the attack.  ECF No. 51 at 2-3.  Defendants contend

that the "attack came suddenly and without warning."  *Id.* at 3.  In response,

Plaintiff states that this "case is not, as Defendants suggest, about

Mr. Ferrell's alleged failure to inform prison staff that he felt he was in

danger."  ECF No. 58 at 3.  Rather, Plaintiff says it is a challenge to several

"blanket policies"[3] which "constitute deliberate indifference to an inmate's

right to be safe while incarcerated."  *Id.*

**Standard of Review**

"The court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus,

summary judgment is proper "after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which

---

[3]The policies involve not segregating inmates, officer training in medical emergencies, providing officers with adequate tools and training to respond to inmate-on-inmate attacks.  ECF No. 58 at 3.

Case No. 4:21cv397-WS-MAF

that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). In this case, the parties were provided sufficient time to conduct discovery. ECF Nos. 11, 24. One motion to extend the discovery deadline was granted, ECF Nos. 32-33, but no further request was made for additional discovery.

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553. The non-moving party must then show[4] though affidavits or other Rule 56 evidence "that there is a genuine issue for trial" or "an absence of evidence to support the nonmoving party's case." Id. at 325, 106 S. Ct. at 2554; Beard v. Banks, 548 U.S. 521, 529, 126 S. Ct. 2572, 2578, 165 L. Ed. 2d 697 (2006).

---

[4] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), cert. denied 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Additionally, "the issue of fact must be 'genuine'" and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (other citations omitted).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000)).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Sconiers v. Lockhart, 946 F.3d 1256, 1262-63 (11th Cir. 2020), and the Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)).

"Summary judgment is not a time for fact-finding; that task is reserved for trial."  <u>Sconiers</u>, 946 F.3d at 1263 (11th Cir. 2020) (citing <u>Tolan v. Cotton</u>, 572 U.S. 650, 655-57, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  <u>Anderson</u>, 477 U.S. at 249, 106 S. Ct. at 2511 (quoted in <u>Sears v. Roberts</u>, 922 F.3d 1199, 1205 (11th Cir. 2019)).

**Undisputed Rule 56 Evidence**

Mr. Ferrell entered the custody of the FDOC on February 27 2018, to serve a three year prison sentence.  ECF No. 51-1.  While housed at Cross City Correctional Institution, Mr. Ferrell received a disciplinary report on December 28, 2018, for possession of gang related materials.  ECF No. 51-2.  He refused to make a statement, declined staff assistance, and was placed in confinement.  ECF No. 51-3.  He was released on January 10, 2019, but was found with a weapon (a shank) on April 15, 2019, and issued another disciplinary report.  ECF No. 51-4.  He again declined to participate in the investigation and was placed in confinement until May 17, 2019. ECF No. 51-5.

On the day following his release from confinement, Mr. Ferrell had several telephone calls with his girlfriend, Ms. Bryant, during which he indicated a concern for his safety because his "homies" were acting weird. Although he was concerned, he also told Ms. Bryant that if something was going to happen to him, he didn't think he would have "made it off the rec yard." ECF No. 51-6[5] (Ex. 6, 3:35 min. mark and again at 5:00 min. mark). He indicated that gang leaders were imposing a 7-day punishment on him: 3 times a day he had to "work out" for 7-days straight for getting caught with the shank. *Id.* at 6:56 min. mark.[6] He ended that phone call by saying "God willing," he would not "get f— up on this rec yard," but he was going out there "with [his] guard up." *Id.* at 14:50 - 15:05 min mark.

Mr. Ferrell called her a second time approximately two hours later. ECF No. 51-7 (Ex. 7). He said that there was suspicion about him and "everybody wanna see a show . . . everybody wanna see [him] get f----- up." *Id.* at 5:02 - 5:16 min. mark. Mr. Ferrell also said that nobody could say he went and "talked to no police." *Id.* at 8:51 - 9:13 min. mark. In

---

[5] Defendants' exhibits 6-9 were presented on a CD (disc 1). The disc contains audio of the telephone calls cited in the summary judgment motion. ECF No. 51.

[6] *See also* ECF No. 46-1 at 22 (evidence submitted with Centurion's summary judgment motion). Rule 56 permits the Court to "consider other materials in the record" and not just evidence cited by the parties. Fed. R. Civ. P. 56(c)(3).

prison vernacular, it is accepted that Mr. Ferrell was saying that he had not "snitched" to prison officials.  Mr. Ferrell also confirmed that he had been "paranoid for like three or four months."  *Id.* at 13:58 -14:05 min. mark.

About a half hour later, Mr. Ferrell called Ms. Bryant a third time. ECF No. 51-8 (Ex. 8).  He said, "I'm on alert.  I ain't got no choice. I gotta go out there . . . ."  *Id.* at 2:30 min. mark.  He said several times that someone (name inaudible) "wasn't himself."  *Id.* at 3:25 - 3:40 min. mark. Mr. Ferrell described how he told him everything that happened - how he went to a "real DR hearing," was in the "box" for 60 days, and took a risk at losing all of his gain time - so he questioned how they could try to "pop" him since he put himself "in a position to lose everything."  *Id.* at 4:42 - 5:53 min. mark.  He wondered "who would do that just to get away from something."  *Id.* at 5:54 mark.  He said he "left no trail" and they were "making up sh–" in their heads with "no proof."  *Id.* at 6:47 - 7:02 min. mark. He relayed how he spoke with some other inmates - his "neighbors" - who told him that he should have had someone looking out for him.  *Id.* at 7:23 - 7:48 min. mark.  He said "I can just feel it; like, I don't know what's gonna happen . . . ."  *Id.* at 9:00 min. mark.  Ms. Bryant said she was "taking this serious" and was "ready to do whatever" he told her to do.  *Id.* at 11:30 -

11:39 min. mark.  Mr. Ferrell never asked her to take any action, although
he said his situation was "wild now."  *Id.* at 13:20 min. mark.

Mr. Ferrell was attacked by inmate Anthony Hannah around 7:10
p.m. on May 18, 2019, near the gate of the recreation yard.  ECF No. 51-11
(Incident Report).  Just prior to the attack, Mr. Ferrell had a brief interaction
with correctional officer David Rhodes.  ECF No. 51-10 (Rhodes
deposition).  Officer Rhodes testified that about 8-10 minutes before the
attack, Mr. Ferrell was "walking around in circles" about 10-15 feet away
from him.  *Id.* at 5.  Mr. Ferrell was saying "this is effed up, this is effed up."
*Id.*  Mr. Ferrell walked over to Officer Rhodes and said, "I'd like to ask you a
question."  When Officer Rhodes responded with "what do you need," he
indicated that Mr. Ferrell said something like "aw, never mind" and walked
away.  *Id.*  Approximately 8 or 10 minutes later, Officer Rhodes heard
Sergeants Speegle and Ward screaming "get on the ground."  *Id.*  Officer
Rhodes ran to the front gate and upon arrival, saw two inmates in
handcuffs.  *Id.*  He did not witness the attack.  *Id.*

Sergeants Speegle and Ward were standing at the gate to the
recreational yard, engaged in conversation, when Mr. Ferrell ran through,
followed by inmate Hannah.  ECF No. 51-13 at 7, 10.  At the time of the

attack, there were at least three officers present on the "rec yard," plus an officer in the tower. *Id.* at 8. Sergeant Ward said that when Mr. Ferrell approached the gate he "was looking back stating, 'Come on man, it doesn't have to be like that.'" *Id.* at 10. When Mr. Ferrell got approximately three feet from the gate, he "took off running towards the gate" which was "cracked open while" the two Sergeants were talking. *Id.* When Mr. Ferrell began running, inmate Hannah pulled out a "homemade shank from his waistband and" charges toward the Sergeants and Mr. Ferrell. *Id.* Sergeant Ward testified in his deposition that Sergeant Speegle attempted to close the gate but was unable to" do so. *Id.* He further said that they both moved out of the way at first because they "didn't know if he was trying to attack [them] or if he was trying to attack Inmate Ferrell." *Id.* at 11.

Sergeant Justin Speegle submitted a report which states that he saw inmate Hannah running towards Mr. Ferrell "with a weapon in his hand." ECF No. 51-11 (Incident Report). Inmate Hannah stabbed Mr. Ferrell in the torso area, and Sergeant Justin Ward reacted quickly by administering chemical agents on inmate Hannah and then placing him in restraints. *Id.*; *see also* ECF No. 51-13 at 11. Mr. Ferrell moved in the direction towards where inmate Hannah threw his weapon, and Sergeant Speegle

"administered chemical agents in the direction of Inmate Ferrell in order to deter him from retrieving the weapon."  ECF No. 51-11.  "Inmate Ferrell was unable to grab the weapon and avoided the chemical agents."  *Id.*[7] Mr. Ferrell was ordered to lay down on the ground and he complied.  *Id.* As soon as Sergeant Ward was able to restrain inmate Hannah, he called for assistance and medical.  ECF No. 51-13 at 11.  Sergeant Ward testified that he did not know Mr. Ferrell was in danger until he saw inmate Hannah pull the knife out of his waistband, but even then, he only "knew there was a risk to someone."  *Id.*  He did not "know who he was going to try to attack."  *Id.*

Defendants' evidence includes a video of the attack on Mr. Ferrell on May 18, 2019.  Ex. 12.[8]  The video shows two correctional officers who are standing at a fenced gate, the gate is slightly open.  *Id.*  Just after the 5 minute mark in the video, Mr. Ferrell can be seen entering the area from the right.  He appears to be talking with someone out of camera view to the right.  He is gradually moving backwards towards the left side of the video,

---

[7] Also demonstrating that Mr. Ferrell successfully avoided the chemical agents is a witness statement provided by LPN J. Dionne which said that chemical agents were not detected "by visual or smell on [Mr. Ferrell] during the exam."  ECF No. 15-15.

[8] All video evidence was submitted under seal.  *See* ECF No. 47.

which is toward the gate and the two officers.  Suddenly, at the 5:32 minute

mark, he moves quickly toward the gate with another inmate in pursuit.  At

the 5:38 minute mark, the inmate begins running toward Mr. Ferrell, who is

making an exit through the gate, in between the officers.  As Mr. Ferrell

goes through the gate at the 5:40 mark, he points back at the other inmate.

The officer on the right attempts to grab the other inmate and stop him, but

he is unsuccessful and the inmate pursues Mr. Ferrell outside the gate.

The inmate can be seen making jabbing motions toward Mr. Ferrell, and at

the 5:45 mark, Mr. Ferrell falls to the ground.  Within three seconds, one of

the officers uses OC spray on the inmate who attacked Mr. Ferrell, and he

immediately drops to the ground.  Meanwhile, Mr. Ferrell got back on his

feet and attempted to run away.  The second officer uses his OC spray in

Mr. Ferrell's direction.  At approximately the 6-minute mark, Mr. Ferrell

goes to his knees and then lays back down on the ground.  ECF No. 51-12.

Several other officers arrive and appear to speak with Mr. Ferrell.  *Id.*

At the 7:09 mark, Mr. Ferrell stands up and takes a few steps before

collapsing on the ground approximately 10 seconds later.  In approximately

four minutes after the stabbing, an inmate arrives with a wheelchair and

Mr. Ferrell is assisted into the wheelchair.  ECF No. 51-12.

Exhibit 17 is a handheld video, with audio, beginning at 7:03 p.m. ECF No. 51-17. It shows Mr. Ferrell getting into the wheelchair, being taken to the medical building, and then being assessed and bandaged by medical personnel. *Id.* It takes almost three and a half minutes to get Mr. Ferrell into the medical building, and the nurse begins examining him at the 3:45 min. mark.[9] *Id.* At the 4:33 min. mark, a correction officer enters the medical examination room and advised that they were calling 911, and the nurse advised that Mr. Ferrell was having trouble breathing. ECF No. 51-17. At 6:10, it's announced that "they're on their way." *Id.*

At the 6:20 min. mark, one of the officers asked if they could get "any information about him." ECF No. 51-17. The response was, "this is bad." *Id.* Two nurses continue to attempt to obtain Mr. Ferrell's vital signs, they give him oxygen, and work with him as he is obviously having trouble breathing. *Id.* The medical records show that Mr. Ferrell was in Tachycardia (rapid, weak pulse), had Tachypnea (rapid, shallow breathing), and medical staff were unable to obtain his blood pressure. ECF No. 46-1 at 24. He had a hand laceration, a right flank puncture wound, and a "fatal penetrating stab wound of the epigastrium with

---

[9] That amounts to a nearly six minute period of time before Mr. Ferrell receives medical care. *See also* ECF No. 46-1 at 12.

perforation of the anterior chest wall, the jejunum, the gut mesenteries, and the right paravertebral muscle with associated retro peritoneal hemorrhage." *Id.* at 12, 24.

Approximately 13 minutes into the video, the nurse takes Mr. Ferrell, by wheelchair, from the medical building to the front gate to meet the ambulance.[10]  ECF No. 51-17.  They arrive 4 minutes later and must wait for the ambulance to arrive, back-up, and then they place Mr. Ferrell in handcuffs, which takes approximately 90 seconds to accomplish.  *Id.*  It is announced that EMS will be flying him to either Shands or North Florida for treatment.  *Id.*  At the 21:25 minute mark. Mr. Ferrell is loaded into the ambulance.  *Id.*  His eyes are open, fixed, and he is no longer responsive. Medical personnel work on Mr. Ferrell inside the ambulance, inserting an IV and it appears they may have initiated resuscitation measures while the ambulance remained parked at the Institution.  At the 43:42 minute mark, EMS announces they are "going to fly him out" and the ambulance door is closed at the 43:50 minute mark and Dixie County EMS departs the

---

[10] On their way to the gate, a sergeant announces that according to his watch, it is 7:28 p.m.  ECF No. 51-17.  It is a long walk to the front gate to meet the ambulance. Notably, Officer Rhodes stated in his deposition that there was a back sally port gate just 100-200 yards from the back of the medical building, but that gate was closed because of a sinkhole.  ECF No. 51-10 at 7-8/

institution.  *Id.*  At the end of the video, Lt. Twombly announces that

Mr. Ferrell would be air-lifted to Shands for treatment and he states it was

8:00 p.m.  *Id.*

Additional evidence submitted indicates Mr. Ferrell was transported

via ambulance to the "Old Town Helipad to be transported via life flight

Helicopter to Shands but the onboard Medical staff stated the Inmate

needed more medical staff to attend to him than the Helicopter could

carry."  ECF No. 51-11 at 2 (Incident Report).  Therefore, Mr. Ferrell was

"transported via ambulance the rest of the way to Shands Hospital."  *Id.*  He

arrived at approximately 9:00 p.m. and was placed in Trauma Room #2.

*Id.*  His condition deteriorated during transport and upon "arrival at Shands

at UF he was unresponsive and in cardiac arrest."  ECF No. 51-19 at 1.  A

chest tube was inserted and thoracotomy performed by trauma physicians.

*Id.* at 1-2.  Nearly 12 minutes after arriving at Shands, he was moved to an

operating room, but "was pronounced deceased at approximately 2140

hours" (9:40 p.m.).  ECF No. 51-11 at 1-2.  The cause of death was listed

as "hemorrhagic shock" from a stab wound to abdomen.  ECF No. 46-1 at

34.

The evidence submitted shows that the Department takes precautions in seeking to ensure the safety of inmates by conducting "[m]ass searches, pat searches, body searches," and strip searches.  ECF No. 51-10 at 9 (Rhodes deposition). *see also* ECF No. 58, Ex. #5, Harrell Deposition at 38.  Officer Rhodes stated that "you're just not going to get all of it."  *Id.*  Mr. Harrell said that Department procedure requires searching 25 percent of the inmate population at an institution within a month.  ECF No. 58, Ex. #5, Harrell Deposition at 39.

Officer Rhodes testified that correctional officers are given basic first aid training, *id.* at 6, and training in breaking up inmate-on-inmate violence through defensive tactics.  *Id.* at 7, 15.  If an inmate needs emergency medical assistance, an officer should call for medical and the OIC (Officer in Charge).  *Id.*; *see also* ECF No. 51-10 at 13.  In the meantime, prison staff should provide medical attention until medical staff arrive.  *Id.* at 10.

At the time of the attack on Mr. Ferrell, Officer Rhodes indicated there was an "understaffing" issue for the Department of Corrections.  ECF No. 51-10 at 9.  Nevertheless, he said that if there were insufficient staff, they "didn't have rec."  *Id.* at 12.  Michael Harrell, the Bureau Chief of Security Operations for the Department of Corrections, said that on the day of

incident, Cross City C.I. met its "critical staffing level for that day."  ECF No. 58, Ex. #5, Harrell Deposition at 11, 18, 28, and 47.  He said that on the day of the incident, Cross City C.I. "had the number of security staff needed to operate that facility in a safe manner."  *Id.* at 32.  The Department of Corrections does not, however, mandate a "staffing ratio" for the number of officers to observe a specific number of inmates on the recreation yard.  *Id.* at 34.  In addition, Plaintiff presented the deposition testimony of Vicki Newsome, the bureau chief of population management for the Department of Corrections.  ECF No. 58, Ex. #6, Newsome deposition at 16.  She said that the population at the "main unit" of Cross City C.I. on the day of the incident was 1,025.[11]  *Id.* at 19.  The maximum capacity for the main unit was 1,022.  *Id.* at 21.  Count is usually taken at midnight, so Ms. Newsome was unable to say with certainty that at the time of the incident the inmate population was three inmates over capacity due to locking up inmates from the work camp.  *Id.* at 22.  Also at the time of Mr. Ferrell's attack, Cross City C.I. had a "17 percent vacancy rate," which Ms. Newsome said was "not the worst vacancy rate," and "not the best" rate either.  *Id.* at 35.  She

---

[11] She was unaware how many staff were working at the Institution on that date. Ex. #6 at 21.

clarified that even though a "facility may have vacancies, they can still fill the positions necessary utilizing overtime." *Id.* at 37.

Additionally, Officer Rhodes testified that he had previously given a deposition in relation to a "stabbing at Echo dorm at Cross City" C.I.  ECF No. 51-10 at 4.  Officer Rhodes was unaware, however, of whether that inmate stabbing occurred before or after the stabbing of Mr. Ferrell.  *Id.*

Finally, Officer Rhodes said that when he arrived on scene, he could see the "stab wound" to Mr. Ferrell and knew it "was a medical emergency."  ECF No. 51-10 at 8.  He indicated that he was sent to the control room to gather some materials, but gathered that "Mr. Ferrell was deceased before they ever rode him off to medical in the wheelchair."  *Id.*

**Analysis**

The Eighth Amendment governs "the treatment a prisoner receives in prison and the conditions under which he is confined . . . ."  Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994) (quoting Helling v. McKinney, 509 U.S. 25, 31, 113 S. Ct. 2475, 2480, 125 L. Ed. 2d 22 (1993)).  The Eighth Amendment guarantees that prisoners will not be "deprive[d] . . . of the minimal civilized measure of life's necessities."  Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392,

2399, 69 L.Ed.2d 59 (1981) (quoted in <u>Chandler v. Crosby</u>, 379 F.3d 1278, 1289 (11th Cir. 2004)).  "[B]asic human necessities include food, clothing, shelter, sanitation, medical care, and personal safety."  <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1511 (11th Cir. 1991) (cited in <u>Collins v. Homestead Corr. Inst.</u>, 452 F. App'x 848, 850-851 (11th Cir. 2011)).

However, it is well established that a government official "'may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior' in a § 1983 action."  <u>Rosa v. Fla. Dep't of Corr.</u>, 522 F. App'x 710, 714 (11th Cir. 2013) (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009)).  Thus, to state a claim against the Defendant Dixon, the Secretary of the Department of Corrections, Plaintiff must show that the Defendant's policy or custom violates the Eighth Amendment.  <u>Rosa</u>, 522 F. App'x at 714 (citing <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 690–91, 98 S. Ct. 2018, 2035-36, 56 L. Ed. 2d 611 (1978)).

The complaint asserts two separate § 1983 claims against Defendant Dixon based on actions taken in his official capacity.[12]  *See* ECF No. 39 at

---

[12] As an additional note, Defendants removed this case to federal court from state court.  ECF No. 1.  Thus, Defendant Dixon has consented to the jurisdiction of the federal forum and waived Eleventh Amendment immunity from suit.  <u>Lapides v. Bd. of Regents of Univ. Sys. of Georgia</u>, 535 U.S. 613, 620, 122 S. Ct. 1640, 1644, 152 L.

7, 10.  The first claim challenges a custom or policy of failure to protect, *id.* at 7, and asserts that Defendant Dixon was deliberately indifferent to the safety of inmates at Cross City Correctional Institution, including Larian Ferrell.  *Id.* at 9.  The second claim is that Defendant was deliberately indifferent by failing to protect "Larian Ferrell from injury and death and to protect inmates from avoidable and senseless injuries and death, in addition to providing inmates with constitutionally safe living conditions and access to medical care, including emergency care."  *Id.* at 10.  Although the complaint overlaps these claims, the Court construes them as raising, first, a claim concerning the protection of inmates and, second, the provision of medical care.  This separation of claims comports with Plaintiff's response to the summary judgment motion.  *See* ECF No. 58 at 2.

## 1.    Failure to Protect

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners."  <u>Farmer</u>, 511 U.S. at 833, 114 S. Ct. at 1976 (quoted in <u>Rodriguez v. Sec'y for Dep't of Corr.</u>, 508 F.3d 611, 616-17 (11th Cir. 2007)); *see also* <u>Zatler v. Wainwright</u>, 802 F.2d 397, 400 (11th Cir. 1986) ("[I]t is well settled that a prison inmate has

---

Ed. 2d 806 (2002) (holding that when the State "voluntarily agreed to remove the case to federal court," it "voluntarily invoked the federal court's jurisdiction").

a constitutional right to be protected ... from physical assault by other

inmates.").  "Being violently assaulted in prison is simply not 'part of the

penalty that criminal offenders pay for their offenses against society.'"

Farmer, 511 U.S. at 834, 114 S. Ct. at 1977 (quoting Rhodes, 452 U.S. at

347, 101 S. Ct. at 2399).  Because incarceration essentially strips prisoners

"of virtually every means of self-protection and foreclose[s] their access to

outside aid, the government and its officials are not free to let the state of

nature take its course."  Farmer, 511 U.S. at 833, 114 S. Ct. at 1977

(citations omitted).

　　　While prisoners have a right to protection from other inmates, a

prison official "cannot be found liable under the Eighth Amendment . . .

unless the official knows of and disregards an excessive risk to inmate

health or safety; the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference."  511 U.S. at 837, 114 S. Ct. at 1979.

There are two components in a deliberate indifference claim - one

subjective and one objective.  Mosley v. Zachery, 966 F.3d 1265, 1270

(11th Cir. 2020).  "[A] plaintiff must show both that the defendant actually

(subjectively) kn[ew] that an inmate [faced] a substantial risk of serious

harm and that the defendant disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner."  Bowen v. Warden, Baldwin State Prison, 826 F.3d 1312, 1320 (11th Cir. 2016) (quoted in Mosley, 966 F.3d at 1270–71); *see also* Rodriguez, 508 F.3d at 617. "Eighth Amendment liability requires consciousness of a risk," Farmer, 511 U.S. at 840, 114 S. Ct. at 1980, and there can be no liability if the Defendant was not "subjectively aware of a substantial risk of harm."  Davis v. Montgomery Cnty. Comm'n, 817 F. App'x 932, 933 (11th Cir. 2020).

Additionally, prison officials are not constitutionally liable for "every injury suffered by one prisoner at the hands of another" prisoner.  *Id.* at 834, 114 S. Ct. at 1977.  Liability only exists when the defendant prison official is deliberately indifferent to an inmate's safety, Swain v. Junior, 958 F.3d 1081, 1089 (11th Cir. 2020), and that depends "on the facts the prison official knew at the time she [or he] responded to the risk of harm to the prisoner."  Mosley, 966 F.3d at 1271.  "In deliberate-indifference cases, as in life, context matters."  966 F.3d at 1272.

Defendant argues that correctional officers on the recreational yard at Cross City C.I. quickly stopped inmate Hannah from further attacking Mr. Ferrell, they secured the scene, retrieved the weapon used, and

immediately called for medical to provide care to Mr. Ferrell.  ECF No. 51

at 13.  Defendant contends that the officers responded in accordance with

policy and procedure.  *Id.*  Further, Defendant states that "Plaintiff has not

specified which policies or customs he believes were insufficient nor how

they were the direct causal link to Mr. Ferrell's death."  *Id.* at 12.  In

particular, Defendant relies on undisputed evidence which shows that

Mr. Ferrell never alerted any prison official to his fear that he was likely to

be attacked.

In response, Plaintiff points to language from <u>Farmer v. Brennan</u> in

which the Supreme Court said that a prisoner's "failure to give advance

notice [of an attack] is not dispositive."  ECF No. 58 at 13 (citing to <u>Farmer</u>,

511 U.S. at 848, 114 S. Ct. at 1984).  Plaintiff argues that "[a]n official

cannot escape liability simply by showing that he was unaware the claimant

was likely to be assaulted."  *Id.* (citing <u>Farmer</u>).  The Supreme Court was

concerned that the district court below "may have placed decisive weight

on petitioner's failure to notify respondents of a risk of harm."  511 U.S. at

848, 114 S. Ct. at 1984.  The district court had relied exclusively on

evidence showing that the petitioner never told prison officials of his

concern for his safety.  *Id.*  However, the Court specified that prison

officials' awareness of a substantial risk of harm may be shown through "any relevant evidence."[13]  *Id.*  The Court was not eliminating the requirement that some knowledge of harm must be proven.  Indeed, the holding of <u>Farmer</u> is that liability exists under the Eighth Amendment only if the prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  511 U.S. at 847, 114 S. Ct. at 1984.

In this case, Plaintiff attempts to show that "a substantial risk of serious harm existed" by pointing out that "Officer Rhodes witnessed at least two stabbings within an apparently short period."  ECF No. 58 at 13.  That evidence is insufficient because Officer Rhodes was unaware of whether the other stabbing occurred before or after the stabbing of Mr. Ferrell.  Moreover, situations which "constitute widespread abuse" that are sufficient to put a supervisory official on notice of the need to take corrective action "must be obvious, flagrant, rampant and of continued

---

[13] Evidence in that case showed that the petitioner in <u>Farmer</u> was "a 'non-violent' transsexual who, because of petitioner's 'youth and feminine appearance' [was] 'likely to experience a great deal of sexual pressure.'"  Respondents' own statements indicated they were aware "there was 'a high probability that [petitioner] could not safely function at USP–Lewisburg,'" and that releasing the transsexual inmate into the general population could post a significant threat to petitioner's safety and to the prison's internal security.  <u>Farmer</u>, 511 U.S. at 848, 114 S. Ct. at 1984-85.

duration, rather than isolated occurrences." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir.1999) (quoted in Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014) (holding that four assaults was not a "constant threat of violence" but more akin to "occasional, isolated attacks"). Two incidents are not sufficient to show a widespread problem.

Plaintiff also contends that a serious risk of harm existed because the Department's 2019 Annual Report[14] shows that a "majority of FDOC's offenders are incarcerated for violent offenses, and fifteen percent of its offenders released in 2019 and 2020 have a gang affiliation." Id. (citing to Plaintiff's Ex. #3). Plaintiff's evidence supports only a "generalized awareness" of risk of harm which exists in a prison environment which is insufficient to satisfy the "subjective awareness requirement" of an Eighth Amendment claim. Bowen v. Warden Baldwin State Prison, 826 F.3d 1312, 1321 (11th Cir. 2016) (citing Carter v. Galloway, 352 F.3d 1346, 1350 (11th Cir. 2003)).

---

[14] Plaintiff also submitted a Report of the Office of the Inspector General, Plaintiff's Exhibit #7. ECF No. 58-1 at 185-352. The Report appears to have been issued in response to a complaint concerning understaffing issues. Id. at 191-192. It dealt with the time period between 2014 - 2015 and was completed in April 2016, three years prior to the event at issue. Id. at 350.

Plaintiff has provided no evidence to show that the inmate who attacked Mr. Ferrell had a reputation or history of violence. No evidence was presented to show that numerous stabbings had occurred at the Institution such that Defendant Dixon was on notice of a significant risk of harm which should have prompted additional safety measures. No evidence was presented to show that any of the prison staff should have anticipated, and thus, prevented the attack.

Plaintiff has also argued that understaffing was an issue known to Defendant Dixon. ECF No. 58 at 20-21. Again, no evidence was presented to show that insufficient staffing levels caused or contributed to the stabbing of Mr. Ferrell. Notably, at the time of the attack, two Sergeants were present with the two inmates involved, and the Sergeants were standing less than fifteen feet away when inmate Hannah suddenly stabbed Mr. Ferrell in less than seven seconds. There is no causal connection between staffing issues and the attack on Mr. Ferrell.

Plaintiff argues that DOC fails "to meaningfully screen for homemade weapons," ECF No. 58 at 17, but that falls short of demonstrating that the DOC has been deliberately indifferent to the need to check inmates for

contraband, including weapons.[15]  The evidence reveals that screening policies are in place and are utilized to eliminate the possession of weapons.  Such efforts may be meaningful even though they are not perfect.

Plaintiff also argues that the only tools given to correctional officers to prevent inmate violence are handcuffs, pepper spray, and a radio.  ECF No. 58 at 18.  In light of the sudden nature of the attack on Mr. Ferrell, the Court questions what other tool could have effectively prevented the spontaneous attack except by separating the inmates through protective custody or a transfer.  Those actions, however, require notice that an inmate is in fear of another inmate.  That notice was not given.

The video evidence shows that officers immediately responded when Mr. Ferrell suddenly bolted through the gate.  They attempted to prevent inmate Hannah from following him by reaching for inmate Hannah, but were unable to grab him and prevent the sudden and unanticipated attack; it happened too quickly.  But it did not happen because Defendant Dixon was deliberately indifferent to a substantial risk of harm to Mr. Ferrell.

---

[15] Indeed, a cell search led to the discovery of a shank in Mr. Ferrell's cell.  ECF No. 51-4.

Plaintiff also makes much of the fact that this incident was gang-related.  ECF No. 58 at 18-19.  Doing so assumes that inmate Hannah was a gang member, but no such evidence has been provided to prove that point.  It is unknown whether inmate Hannah was a member of the gang with which Mr. Ferrell was affiliated, or another, rival gang.  Further, it may be inferred that the attack happened because of the belief that Mr. Ferrell was careless for getting caught with a shank, or that he may have snitched on someone, or he was trying to get away from someone.  None of those inferences draw a causal connection to a failure to have greater policies concerning gangs.  It is unknown why Mr. Ferrell was attacked.

As to this first claim, the Court is unable to conclude that any policy or custom or practice attributable to Defendant Dixon led to the unfortunate stabbing of Mr. Ferrell.  "A municipality may not be held liable under § 1983 unless a municipal policy or custom caused the plaintiffs' injury."  Monell, 436 U.S. at 694, 98 S.Ct. 2018 (cited in Swain, 958 F.3d at 1091).  Likewise, Defendant Dixon - as the Secretary of the Department of Corrections - cannot be held liable unless his policy caused or at least contributed to the stabbing of Mr. Ferrell.  Plaintiff points to no such policy,

or lack thereof, and summary judgment should be granted in Defendant's favor on Count 1.

## 2.    Failure to Provide Medical Care

The Eighth Amendment imposes a duty on prison officials to provide medical care as well.  Deliberate indifference to a prisoner's serious medical need violates the Eighth Amendment's prohibition against cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quotations omitted) (quoted in Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011)).  There is no dispute that Mr. Ferrell had a serious medical need.

In a claim for the denial of medical care, a plaintiff must show: "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts."  Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000), cert. denied, 531 U.S. 1077 (2001); Farrow, 320 F.3d at 1243.

Put another way, to show a defendant acted with deliberate indifference, "a prisoner must show the prison official's: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence.'" Bingham, 654 F.3d at 1176 (quoting Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)).

Here, Plaintiff contends that placing "correctional officers who lack specific tools and authority to handle a medical emergency . . . is a striking example of deliberate indifference to a predictable and known risk to the safety of its inmates." ECF No. 58 at 16. The evidence shows that correctional officers have training in rendering basic first aid and are trained to immediately call for medical assistance in the event of an inmate's medical emergency. Plaintiff contends that the failure of officers to call 911 at the scene of the stabbing is deliberate indifference, and that Defendants have not shown that officers are authorized to do so. ECF No. 58 at 23-24. Plaintiff notes that Officer Rhodes observed the seriousness of Mr. Ferrell's injuries and "assumed he was dead before he was even wheeled to the prison's medical area." Id. at 34. Even so, Plaintiff contends that "no one called 911 at the scene, or administered CPR, or attempted to mitigate

Mr. Ferrell's bleeding." *Id.* at 23-24. Instead, he was handcuffed,[16] placed in a wheelchair, taken to medical, and then a telephone call was placed to 911. *Id.* at 24. Plaintiff contends that the "failure to provide tools, training, and authority to correctional officers faced with true medical emergencies where time is a critical factor shows FDOC's deliberate indifference . . . ." *Id.*

The record in this case reveals the wisdom of a policy which directs correctional officers to first call medical before calling 911.[17] In the minutes following the stabbing of Mr. Ferrell, there was no need to perform CPR as he was breathing on his own and talking to officers. Further, the fact that Officer Rhodes assumed that Mr. Ferrell was deceased demonstrates the need for persons with medical training beyond basic first aid to properly assess a patient's condition. The evidence is insufficient to show that Defendant's policy amounts to deliberate indifference.

---

[16] Plaintiff said that "officers pepper sprayed Mr. Ferrell," ECF No. 58 at 24, but that is not correct. The evidence shows that chemical agents were sprayed in his direction to keep Mr. Ferrell from retrieving the shank, but the record reveals he avoided the chemical agents and was not sprayed. *See* ECF No. 51-15 at 1; ECF No. 51-11.

[17] Defendant's procedure is for officers to call medical and an officer-in-charge. As a practical matter, correctional officers have a walkie-talkie with them, but not a cell phone. *See* ECF No. 51-10 at 13.

Case No. 4:21cv397-WS-MAF

It is true that "intentional ... delay of medical care is evidence of deliberate indifference." Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990) (quoted in Colardo-Keen v. Rockdale Cnty., Georgia, 775 F. App'x 555, 568 (11th Cir. 2019)). Plaintiff makes much of the distance that had to be traveled in taking Mr. Ferrell to medical following the stabbing, and then to the front gate where he could be transferred to an ambulance. ECF No. 58 at 30-32. Plaintiff contends it was "nearly two hours after his stabbing before he arrived at the hospital." Id. at 30.

While that is true, Mr. Ferrell was under the care of Dixie County EMS approximately 25 minutes after the stabbing. Even though it was a long walk from medical to the front gate, prison officials still had to wait on the ambulance to arrive.[18] The amount of time it took to transport Mr. Ferrell to Shands for more advanced medical care is not due to a policy or practice of the FDOC. Further, the adequacy of the medical care provided is no longer an issue since Plaintiff has dismissed the claim

---

[18] The long walk from medical to the front gate was due to a sinkhole. It is unknown how long that condition existed, or whether it matters. Staff still had to wait on the ambulance to arrive and no evidence was provided which clarifies whether any time would have been gained if the ambulance had arrived at thea back gate as opposed to the front gate.

brought against Centurion; the only issue presented here is whether there was a delay in providing such care, which there was not.

The undisputed evidence in this case is that within approximately seven minutes of the attack, Mr. Ferrell was receiving medical care and was being assessed by two nurses.  In the free world, outside the confines of a prison, it is unlikely that any quicker assessment by a medical provider could take place.  There is no evidence of intentional delay by prison officials or medical staff, and there is no evidence that the Defendant was deliberately indifferent to Mr. Ferrell's right to medical care.  Policies exist which require prison officials to immediately call for medical staff in an emergency medical situation; regardless of who makes that phone call, the evidence in this case reveals that took place within 30 seconds of the stabbing[19] and a wheelchair arrived to transport Mr. Ferrell within four minutes.  Because there is no evidence to show that Defendant disregarded knowledge of a serious risk of harm, summary judgment should be granted in Defendant's favor on the Eighth Amendment medical claim as well.

---

[19] It appears that Sergeant Ward radioed for medical staff "almost immediately after the attack."  ECF No. 51 at 20; *see also* ECF No. 58 at 33.

3.    **Florida Wrongful Death Act Claim**

"Florida law provides that a wrongful-death 'action shall be brought by the decedent's personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages, as specified in this act, caused by the injury resulting in death.'" Moss v. Leesburg Reg'l Med. Ctr., No. 20-11376, 2021 WL 5175549, at *2 (11th Cir. Nov. 8, 2021) (citing Fla. Stat. § 768.20).  Plaintiff may appropriately bring this action on behalf of his son, Larian Ferrell.  ECF No. 35.

The "public policy" behind the Wrongful Death Act is "to shift the losses resulting when wrongful death occurs from the survivors of the decedent to the wrongdoer." FLA. STAT. § 768.17.  As specified in the Act, "a wrongful death claim arises '[w]hen the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person....'" Fla. Stat. § 768.19 (quoted in Waters v. City of Sunrise, No. 21-CV-62542, 2023 WL 122206, at *10 (S.D. Fla. Jan. 6, 2023)).  Here, Defendant contends that Mr. Ferrell's death was caused solely by inmate Hannah and was not a result of any negligence or breach of a duty owed to Mr. Ferrell.  ECF No. 51 at 20.  Plaintiff contends there is a genuine dispute of material fact as to whether the FDOC breach its duty.  ECF No. 58 at 32-

38.  In particular, Plaintiff contends the FDOC breached its duty in failing "to implement adequate policies related to segregation, searches, and discipline of inmates," failing to "ensure adequate staffing, training, supervision, and instruction of employees," failing to create or implement "adequate policies governing how employees respond to medical emergencies," and in failing "to make sure adequate medical care was quickly accessible in the event of medical emergencies."  *Id.* at 34.

The FDOC has policies concerning searches of inmates.  Those policies discovered the shank possessed by Mr. Ferrell, but not the one possessed by inmate Hannah.  That a policy is not 100 percent effective does not mean it is negligent.

Although Plaintiff challenges the lack of a policy concerning segregating inmates, that assertion misses the mark.  Even if a policy was in place to segregate inmates, it would presumably separate gangs; doing so would have made no difference in this case.  The reasonable inference from the evidence in this case is that Mr. Ferrell and his attacker belonged to the same gang.[20]  Any policy of segregation would have kept the two inmates together absent a complaint made to prison officials that

---

[20] Mr. Ferrell's telephone calls to his girlfriend reveal he was concerned that his "homies" were acting weird and he would be punished by leaders from his gang.

Mr. Ferrell was in fear of members of his own gang.  That complaint was never made.

Plaintiff also suggests that inmates should be segregated so that violent inmates are not housed with non-violent inmates.  ECF No. 58 at 36.  The problem with that assertion is that no evidence was provided to show that inmate Hannah was a violent inmate, with a violent history, or that he was convicted of a violent offense such that he should have been segregated from Mr. Ferrell who was serving a three year sentence for a drug-related conviction.  *See* ECF No. 58 at 4.

The evidence does not demonstrate that Defendant failed to create adequate policies for responding to medical emergencies.  Mr. Ferrell was seen by medical staff within approximately seven minutes.  Even if he was examined by medical staff within 30 seconds, it likely would have no impact on the outcome because Centurion medical staff could not perform emergency surgery.  The evidence in this case shows that medical care was quickly accessible and provided to Mr. Ferrell.  FDOC personnel as well as Centurion medical staff acted with reasonable diligence to get Mr. Ferrell the advanced medical care he required and were not deliberately indifferent.  Plaintiff has not pointed to any policy of the

Defendant which caused Mr. Ferrell's death.  Thus, summary judgment should be granted in Defendant's favor as to the wrongful death claim.

## **RECOMMENDATION**

It is respectfully **RECOMMENDED** that Defendants' motion for summary judgment, ECF No. 51, be **GRANTED** and judgment entered in Defendant's favor as to all claims.

**IN CHAMBERS** at Tallahassee, Florida, on August 7, 2023.


 S/     Martin A. Fitzpatrick
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**


## **NOTICE TO THE PARTIES**

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**